IN THE MATTER OF NANCY ELLEN JOBES.

Argued November 5, 1986—Decided June 24, 1987.

*Raymond M. Tierney, Jr.,* argued the cause for appellant Lincoln Park Nursing and Convalescent Home (*Shanley & Fisher* and *Traynor & Hogan,* attorneys; *Raymond M. Tierney, Richard E. Brennan, Richard J. Traynor, Vincent J. Infinito* and *Lisa M. Goldman,* on the briefs).

*Alfred A. Slocum,* Public Advocate, argued the cause for appellant *pro se* (*Alfred A. Slocum,* attorney; *Denise L. Sanders,* Assistant Deputy Public Advocate, on the briefs).

*Richard Kahn,* guardian *ad litem* of Nancy Ellen Jobes, argued the cause for respondent *pro se* (*Richard Kahn,* attorney; *Richard Kahn* and *Lauren V. Kessler,* on the brief).

*Paul W. Armstrong* argued the cause for respondent John H. Jobes, III (*Paul W. Armstrong,* attorney; *Paul W. Armstrong* and *Edward J. O'Donnell,* on the brief).

*Steele R. Chadwell,* General Counsel, argued the cause for *amicus curiae* Office of the Ombudsman for Institutionalized Elderly of the State of New Jersey (*Steele R. Chadwell,* attorney; *James E. Madden* and *Louis G. Karagias,* on the brief).

*Richard P. Maggi* submitted a brief on behalf of *amici curiae* Board of Directors of the United Handicapped Federation and the Association for Retarded Citizens/Minnesota (*McDermott, McGee & Ruprecht,* attorneys).

*Charles C. Deubel, III,* submitted a brief on behalf of *amicus curiae* Concern for Dying.

*Charles J. Farley, Jr.,* submitted a brief on behalf of *amicus curiae* National Association of Prolife Nurses (*Farley & Farley,* attorneys).

*William F. Bolan, Jr.,* submitted a brief on behalf of *amicus curiae* New Jersey Catholic Conference.

*William I. Strasser* submitted a brief on behalf of *amicus curiae* New Jersey Chapter of American College of Physicians (*Donohue, Donohue, Costenbader & Strasser,* attorneys).

*John R. Heher* submitted a brief on behalf of *amicus curiae* New Jersey Hospital Association (*Smith, Stratton, Wise, He-*

her & Brennan, attorneys; *John R. Heher* and *Wendy L. Mager*, on the brief).

*Anne M. Perone* submitted a brief on behalf of *amicus curiae* New Jersey Right to Life Committee, Inc.

*Fennella Rouse* and *Elena N. Cohen,* members of the New York bar, and *Jo Anne C. Adlerstein* submitted a brief on behalf of *amicus curiae* Society for the Right to Die, Inc. (*Stern, Dubrow & Marcus,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Today, in *In re Peter,* 108 *N.J.* 365 (1987), we set forth the guidelines and procedures under which life-sustaining medical treatment could be withdrawn from an elderly nursing home patient in a persistent vegetative state who, prior to her incompetency, had clearly expressed her desire not to be sustained in that condition. This appeal requires us to develop the guidelines and procedures under which life-sustaining medical treatment may be withdrawn from a non-elderly nursing home patient in a persistent vegetative state who, prior to her incompetency, failed to express adequately her attitude toward such treatment. Specifically, we must determine who decides for the incompetent patient, the standard that the surrogate decisonmaker must use, and who must be consulted and concur in the decision.

Embarking on this task, we are mindful that the patient's right to self-determination is the guiding principle in determining whether to continue or withdraw life-sustaining medical treatment; that therefore the goal of a surrogate decision-maker for an incompetent patient must be to determine and effectuate what that patient, if competent, would want; and that the court does not decide whether to withdraw life-supporting treatment. Rather, our role is to establish for those who make that decision criteria that respect the right to self-determination and yet protect incompetent patients.

## I

Since July 1980, Nancy Jobes has been a resident patient at the Lincoln Park Nursing Home (hereinafter nursing home). In May 1985 her husband John and her parents requested that the nursing home withdraw the jejunostomy tube (hereinafter j-tube), which provides her with nutrition and hydration. The nursing home refused on moral grounds.

Thereafter Mr. Jobes asked the Chancery Division to "authorize and order" the withdrawal of the j-tube.[1] He contended that his wife was in a persistent vegetative state, and that therefore he and her family had concluded that she would choose to terminate artificial feeding and that it was in her best interests to do so.

The trial court appointed Richard Kahn, Esq., as guardian *ad litem* for Mrs. Jobes. After reviewing the medical evidence and interviewing her family, close friends and clergyman, Mr. Kahn filed a report in favor of Mr. Jobes' decision. The nursing home then moved for the appointment of a "life advocate." The trial court denied that motion. *In re Jobes*, 210 *N.J.Super.* 543 (Ch. Div. 1986). The nursing home unsuccessfully appealed that decision.

The Public Advocate intervened, with the consent of Mr. Jobes and Mr. Kahn, as a party in opposition to them.

Prior to trial, the judge visited Mrs. Jobes at the nursing home and filed an observation report. After a seven-day trial, the court found that Mr. Jobes had proved by clear and convincing evidence that his wife is in a persistent vegetative state with no prospect of improvement, and that, if competent, she would not want to be sustained by the j-tube under her present circumstances. The court therefore authorized Mr. Jobes to implement removal of the j-tube under the supervision of a licensed physician. However, the court held that the nursing

---

[1] Incident to a prior medical malpractice action, John Jobes had already been appointed guardian of his wife when he made the request at issue here.

home was entitled to refuse to participate in the withdrawal of the j-tube and could keep Mrs. Jobes connected to it until she was transferred out of that facility. Judgment was entered on April 28, 1986, but relief was stayed pending final determination of this appeal. Both Mr. Jobes and the nursing home petitioned this court for direct certification, which we granted. 105 *N.J.* 532 (1986).[2]

## II

Nancy Ellen Jobes is thirty-one years old. She is the daughter of Robert and Eleanor Laird, both of whom are living. She has three living siblings. She married John H. Jobes, III, on July 31, 1976. Prior to March of 1980, Mrs. Jobes had no significant mental or physical handicap. She was employed as a certified laboratory technologist, and was four and one-half months pregnant with her first child.

On March 11, 1980, Mrs. Jobes was admitted to Riverside Hospital for treatment of injuries sustained in an automobile accident. Doctors soon determined that her fetus had been killed. During the course of an operation to remove the dead fetus, she sustained a severe loss of oxygen and blood flow to her brain. She suffered massive and irreversible damage to the part of her brain that controls thought and movement.[3] She has never regained consciousness.

---

[2]The Ombudsman for the Institutionalized Elderly, the New Jersey Hospital Association; American College of Physicians, New Jersey Chapter; Society for the Right to Die, Inc.; New Jersey Catholic Conference; New Jersey Right to Life Committee, Inc.; Concern for Dying; National Association of Prolife Nurses; and Board of Directors of the United Handicapped Federation and the Association for Retarded Citizens/ Minnesota have participated as *amici curiae* on this appeal.

[3]Because the portion of her brain that controls vegetative functions was not destroyed, Mrs. Jobes is not "brain dead." *See In re Conroy,* 98 *N.J.* 321, 356–57 (1985); *In re Quinlan,* 70 *N.J.* 10, 24, 27–28, *cert.* denied *sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976).

On July 28, 1980, Mrs. Jobes was transferred to the nursing home.[4] Her condition has not changed since she was admitted. She is unable to speak or make any kind of noise. A towel is kept under her chin to catch the secretions that drip from her mouth. She has a tracheostomy, which is covered with a plastic shield to which a flexible tube is attached. An air compressor must humidify the air moving into her throat through this tube to prevent it from becoming clogged with mucous.

She is incontinent and requires a catheter to continuously irrigate her bladder. She receives routine enemas for bowel evacuation. She has chronic urinary tract infections. She is given antibiotics when necessary, as well as medication intended to prevent seizures.

Her muscles have atrophied and her limbs are rigidly contracted. Her extremities cannot be moved. Her closely clenched fingers are padded to prevent the skin between them from deteriorating.

She cannot swallow. Originally she was fed and hydrated intravenously, then through a nasogastric tube, then a gastrotomy tube. In June 1985, complications with the gastrotomy tube necessitated an even more direct approach. Since then, Mrs. Jobes has been fed through a j-tube inserted—through a hole cut into her abdominal cavity—into the jejunum of her small intestine. Water and a synthetic, pre-digested formula of various amino acids are pumped through the j-tube continuously. She has been removed to Morristown Memorial Hospital at least three times because of complications with the j-tube.

After Mr. Jobes instituted this suit, Mrs. Jobes was admitted to Cornell Medical Center-New York Hospital (Cornell) for four days of observation and testing. All of the resulting medical evidence supports Mr. Jobes' characterization of her condition.

---

[4]Pursuant to an order entered during the prior malpractice action, which Mr. Jobes and Mr. and Mrs. Laird settled for $900,000, all of Mrs. Jobes' medical bills are paid by the New Jersey Manufacturers Insurance Company.

Dr. Fred Plum, Professor and Chairman of the Department of Neurology at Cornell, examined Mrs. Jobes every day while she was there. As a witness for Mr. Jobes, he testified that she is in a persistent, i.e., irreversible, vegetative state. Dr. Plum is a world renowned· expert on the "persistent vegetative state." He originally created that term, and is the author of several treatises and numerous articles explaining it. At trial he explained:

> Vegetative state describes a body which is functioning entirely in terms of its internal controls. It maintains temperature. It maintains heart beat and pulmonary ventilation. It maintains digestive activity. It maintains reflex activity of muscles and nerves for low level conditioned responses. But there is no behavioral evidence of either self-awareness or awareness of the surroundings in a learned manner.

*See also Quinlan, supra,* 70 *N.J.* at 24–25 (Dr. Plum's similar explanation of the vegetative state); *President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment* 174–75 (1983) (hereinafter *President's Commission Report*) ("Personality, memory, purposive action, social interaction, sentience, thought, and even emotional states are gone. Only vegetative functions and reflexes persist. If food is supplied, the digestive system functions, and uncontrolled evacuation occurs; the kidneys produce urine; the heart, lungs, and blood vessels continue to move air and blood; and nutrients are distributed in the body.") (footnote omitted).

Dr. David E. Levy, an associate professor of neurology at Cornell and an associate of Dr. Plum, was retained as an expert by both the Public Advocate and the guardian *ad litem,* but testified only for the guardian *ad litem.* Dr. Levy is the author of numerous publications on brain damage resulting from a reduction in bloodflow and oxygen, and the persistent vegetative state. He has studied over six hundred comatose patients.

Dr. Levy observed and tested Mrs. Jobes far more extensively than any of the other neurological experts. He observed her first at the nursing home and then every day that she was at

Cornell. He spent several hours with her during each of the days that a positron-emission tomograph scan and a nuclear magnetic resonance scan were conducted. On the basis of his clinical observations, Dr. Levy concluded that Mrs. Jobes is in a persistent vegetative state without any chance of recovery.

All the laboratory tests performed on Mrs. Jobes at Cornell were consistent with that diagnosis. A CAT scan and the nuclear magnetic resonance scan both indicated atrophy of the cerebral brain tissue.[5] The position emission tomograph scan indicated that blood flow and metabolism in Mrs. Jobes' cerebral cortex are only thirty to forty percent of that of a normal cognitive brain. This level of brain activity is found in persons under very deep anesthesia and those who have suffered a massive loss in brain function.

Several other doctors examined Mrs. Jobes at the Nursing Home, and testified about their observations. Dr. Henry Liss, a neurosurgeon and Professor of Neurological Surgery at the College of Physicians and Surgeons of Columbia University, and an associate professor of surgery at Rutgers Medical School, and Dr. Daniel Carlin, a neurologist and an associate professor of neurology at Rutgers Medical School, testified for Mr. Jobes. Each reviewed Mrs. Jobes' medical reports, and examined her in June and again in the Autumn of 1985. Each of them concluded that she is in a persistent vegetative state with no chance of recovery.

Dr. Allan H. Ropper, an associate professor of medicine at Harvard Medical School and Director of the Neurosurgery-Neurology Intensive Care Unit at Massachusetts General Hospital, and Dr. Maurice Victor, Professor of Neurosurgery at Case Western Reserve University School of Medicine, testified for the nursing home. Neither performed any laboratory tests.

[5]The cerebrum is the main part of the brain, situated in the upper part of the cranium. It controls thinking, sensory perception, and voluntary and conscious activities. 1 *Attorney's Dictionary of Medicine* C–110 (Bender 1986).

Dr. Victor examined Mrs. Jobes once at the nursing home for about one and one-half hours. He testified that although Mrs. Jobes had suffered severe and irreversible cerebral damage, he did not believe that she is in a vegetative state. Dr. Victor had no written record of Mrs. Jobes' responses during his examination of her. He based his opinion on his recollection of her reactions to stimuli. He recalled that on four or five occasions he had said, "Nancy, pick up your head" and that, with only one exception, after one or two seconds, she obeyed. He testified that she had responded to commands to wiggle her toes on eight out of twelve occasions; to move her leg once; to stick out her tongue in response to four or five requests. These responses indicated to Dr. Victor that Mrs. Jobes could hear and understand him and that her brain could connect the cerebral cortex, where hearing and understanding take place, to the muscles that she moved.

Dr. Victor testified that he interpreted Mrs. Jobes' reaction to ammonia under her nose—a "violent grimace" and a retraction of her head—as not purely reflexive. He admitted that this was a "pure interpretation" and that he was less sure about this than he was about her responses to commands.

Dr. Victor testified that he had observed emotions in Mrs. Jobes' facial gestures. He characterized them as "anticipatory" when he entered her room; "intent" when she received commands; "satisfied" when she was congratulated on having responded.

Dr. Ropper, like Dr. Victor, examined Mrs. Jobes at the nursing home for approximately ninety minutes. He observed that she had a wide range of random or spontaneous movements:

> Approximately every thirty seconds to a minute she would lift her right shoulder up off the recliner. She would lift her head from the left armrest off the armrest to sort of a neutral position and move it to the right, taking about three to four seconds to do that, and that she did spontaneously every three to five minutes.

She would move her foot downward and her toes slowly about every ten to forty seconds. She would lift her leg, right leg stiffly off the chair about a half inch to an inch every five to ten minutes.

He testified:

Generally vegetative patients ... have a very narrow range of stereotyped movements that are repeated. [I]n general, moving a limb away from the body is not one of them. Certainly lifting an arm off a recliner or a bed wouldn't be one of them. So higher level movements of that sort or more complicated movements, lifting the head up, moving it to one side and then putting it back, to me, are against the vegetative state.

Like Dr. Victor, Dr. Ropper testified that he had elicited command-responses from Mrs. Jobes.

As a result of his observations, Dr. Ropper concluded that Mrs. Jobes fell "slightly outside of [his] operational definition of the persistent vegetative state." Dr. Ropper defines that state as one in which the patient "is in or has sleep/wake cycles, is totally incapable of responding and is totally unaware of environment or self." His definition is subtly but significantly different from that which was offered by Dr. Plum, and accepted by this court in *Quinlan, supra,* 70 *N.J.* at 25. Primitive reflex responses to external stimuli would exclude a patient from the persistent vegetative state under Dr. Ropper's definition but not under Dr. Plum's.

All of the medical experts retained by the plaintiff, the guardian, and the Public Advocate were unsuccessful in eliciting volitional responses from Mrs. Jobes. They observed the kind of movements reported by Drs. Victor and Ropper, but concluded that they were startle reflexes and random movements rather than evidence of any cognitive awareness.

Some of the nurses and nurses' aides who work at the nursing home testified that they had observed examples of what they interpreted as cognitive awareness on the part of Mrs. Jobes. They claimed that she moved her head to aid them in washing her hair; smiled at appropriate times; followed people with her eyes; and relaxed when spoken to or touched in a soothing manner.

In addition, several nurses and aides testified that they saw tears in Mrs. Jobes' eyes when her family visited. Nurses pointed out the phenomenon they described as "tears" to Dr. Carlin when he examined her at the nursing home. He characterized it as an unemotional collection of secretions in the corner of Mrs. Jobes' eyes. Dr. Liss also observed these secretions. He explained that they are merely accumulations of liquid that keep the conjunctiva moist and that they are created by rapid, reflexive eye-blinking, rather than emotions.

Other nurses and nurses' aides testified that they had not observed any cognitive awareness in Mrs. Jobes, and that she gave no response to their verbal commands.

### III

In the two other cases that we have decided today, *In re Farrell*, 108 *N.J.* 335 (1987), and *In re Peter*, 108 *N.J.* 365 (1987), as well as *Quinlan* and *Conroy*, there was no disagreement among the medical experts about the patient's medical condition or prognosis. Moreover, we have not found a dispute among medical experts over a patient's condition in any other case concerning the withdrawal of life-sustaining treatment. In this case all the medical experts agree that Mrs. Jobes is severely brain damaged. But while the experts for Mr. Jobes, the guardian *ad litem*, and the Public Advocate contend that she is in a persistent vegetative state, the two nursing home experts contend that she falls slightly outside of their definition of the persistent vegetative state.

In *Conroy*, we required that all medical determinations made in the course of a decision to withhold treatment from an incompetent patient be based upon clear and convincing medical evidence. *See* 98 *N.J.* at 368, 381–82. Evidence is "clear and convincing" when it

> produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

[*State v. Hodge*, 95 *N.J.* 369, 376 (1984) (citations omitted).]

█  Evidence may be uncontroverted, and yet not be "clear and convincing." *See In re Colyer*, 99 *Wash.*2d 114, 143–45, 660 *P.*2d 738, 754–55 (Wash.1983) (Dore, J., dissenting) (criticizing the Washington Supreme Court's willingness to accept the uncontroverted prognosis that a patient who had been comatose for only twenty-five days was in a persistent vegetative state in light of the fact that "some physicians have testified in reported cases that a four-to six-month comatose period is used to determine whether there is any improvement in the incompetent, to reach their opinion in testifying as to whether the incompetent would recover to a cognitive or sapient existence"), cited with approval in *Conroy, supra*, 98 *N.J.* at 365.[6]  Conversely, evidence may be "clear and convincing" despite the fact that it has been contradicted.  In this case, the reports and testimony of the Nursing Home's experts are inconsistent with the trial court's conclusion that Mrs. Jobes is in a persistent vegetative state.  Nevertheless, we believe that conclusion was supported by clear and convincing evidence.

Doctors Plum and Levy, each of whom concluded that Mrs. Jobes is in a persistent vegetative state, have devoted their medical careers to the diagnosis, treatment, and prognosis of patients in the persistent vegetative state.  Doctors Victor and Ropper, who testified that Mrs. Jobes has some cognitive ability, are unquestionably accomplished neurologists, but their experience and training in this particular area is comparatively limited.  Moreover, Doctors Victor and Ropper each based his opinion of Mrs. Jobes' condition on a single, ninety-minute observation.  In contrast, Doctors Plum, Levy, Carlin and Liss—all of whom agree that Mrs. Jobes is in a persistent vegetative state—each spent more time with her.  Doctors Plum and Levy in particular based their opinions on extensive clinical and laboratory examinations and observations.

---

[6]Premature diagnosis is not at issue here.  Mrs. Jobes has been in her present condition for 6 years.

We take special note of the testimony of Dr. Levy because, in addition to his having spent the most amount of time with Mrs. Jobes, he was retained by the two most disinterested participants in this case, the Public Advocate and the Guardian *ad litem*. We cannot ignore the possibility that experts retained in order to litigate an extremely emotional issue like the withdrawal of a life-sustaining feeding tube might be partisan.

Accordingly, we conclude that the neurological experts who testified for Mr. Jobes, the guardian *ad litem* and the Public Advocate offered sufficiently clear and convincing evidence to support the trial court's finding that Mrs. Jobes is in an irreversible vegetative state. The trial court heard the testimony, observed the witnesses, and even visited Mrs. Jobes at the nursing home. It was uniquely equipped to decide which experts were more credible. We have always given great deference to trial court evaluations of conflicting medical evidence. *See generally Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597–98 (1977) (Hughes, C.J.) (explaining the "very considerable respect" accorded to trial court evaluations of medical evidence). While we recognize the gravity of the responsibility to evaluate medical evidence in withdrawal-of-treatment cases, we believe that our traditional confidence in the factual determinations made by our trial courts is as appropriate in this as in other contexts.

IV

Mrs. Jobes' closest friends, her cousin, her clergyman, and her husband offered testimony that was intended to prove that if she were competent, Mrs. Jobes would refuse to be sustained by the j-tube. Deborah Holdsworth, a registered nurse and life-long friend of Mrs. Jobes, recalled a conversation in 1971 in which Mrs. Jobes stated that if she were ever crippled like the children with multiple sclerosis and muscular dystrophy that Ms. Holdsworth cared for, she would not want to live. Ms. Holdsworth also recalled telling Mrs. Jobes on numerous occa-

sions that she, Holdsworth, would not want to live like Karen Quinlan did after the removal of her respirator. She recalled that Mrs. Jobes had not disagreed with her, but could not recall Mrs. Jobes' position any more clearly than that. Finally Holdsworth recalled that in late 1979 Mrs. Jobes specifically stated that she would not want to be kept alive on a respirator like a patient suffering from amyotrophic lateral sclerosis whom Ms. Holdsworth had described to her.

Another friend of Mrs. Jobes' since childhood, Donna De-Christofaro, testified that in Autumn 1979 Mrs. Jobes had told her that "it was a shame that [Karen Quinlan] hadn't died when they removed the respirator; that that wasn't living, it was existing; that she had wished that God had taken her then...."

Mrs. Jobes' first cousin, Dr. Cleve Laird, recalled a discussion he had with her in the summer of 1975 about a victim of an automobile accident who was being kept alive by a cardiac stimulator:

> She said that she wouldn't want those measures taken in her case and that she certainly wouldn't want to live that way.
>
> I said, well, they wouldn't do that to me because I carried and still carry a form of identification that says that I do not wish to have any heroic measures taken in case of massive injury.
>
> Subsequent to that she became interested in where I had gotten that and I told her that it was pretty common both at Baylor where I had taught prior to going up to Massachusetts and also at Harvard. I said that I would send her a card. My wife was there and I turned around to her and told her why didn't she send one. Then we moved on into discussion of other technical things.

Dr. Laird testified that his wife had sent the card to Mrs. Jobes, and that Mrs. Jobes thanked them for it in a note she sent them at Christmas. The card has not been found.

John Jobes testified that if his wife were competent, she would "definitely" choose to terminate the artificial feeding that sustains her in her present condition. He generally recalled her having stated that she would not want to be kept alive under Karen Quinlan's circumstances. She did this fre-

quently when the *Quinlan* case was in the news, mostly during 1976–77.[7]

The Reverend George A. Vorsheim, minister of the Morris Plains Presbyterian Church, testified that he had married the Jobes, and that he was familiar with them and with Mrs. Jobes' parents. They are all members of the Presbyterian Church (U.S.A.). The Reverend Mr. Vorsheim testified that Mrs. Jobes was raised in the Presbyterian Faith, and that in the Presbyterian Faith there is no religious requirement to perpetuate life by artificial means nor is there any doctrine prohibiting life-sustaining medical treatment. The Presbyterian Church leaves decisions like the one at issue here to the individual conscience. *See generally* Advisory Council of the Presbyterian Church (U.S.A.) on Church and Society, *An Essay on the Problems Related to the Prolongation of Life by Technological Methods* (1974) (adopted by the 186th General Assembly of the United Presbyterian Church (U.S.A.)); Advisory Council of the Presbyterian Church (U.S.A.) on Church and Society, *The Covenant of Life and the Caring Community and Covenant* (1983) (adopted by the 195th General Assembly of the United Presbyterian Church (U.S.A.)).

## V

In *Conroy* and *Peter* we have described the type of evidence that can establish a person's medical preferences

---

[7]The Public Advocate called two expert witnesses on the subject of the weight to be given to a witness' testimony regarding a prior statement of intent. Dr. Elizabeth Loftus, a specialist in human perception and memory, testified that the conversations remembered by Holdsworth, DeChristofaro, Laird, and Jobes should be treated with suspicion because of the length of time that had elapsed since the time of the conversations and because post-event information could have affected their memories. Dr. Irving Crespi, an expert in opinion and attitude research, testified that a statement of intent by itself is not very valuable in predicting behavior. The trial court admitted the testimony on a tentative basis and considered it when weighing the evidence as to statements attributed to Mrs. Jobes, but did not make any specific ruling on the general admissibility of these novel areas of expert testimony. Neither do we.

under the "subjective test." *See Peter, supra,* 108 *N.J.* at 377–379; *Conroy, supra,* 98 *N.J.* at 361–63. We have explained that the probative value of prior statements offered to prove a patient's inclination for or against medical treatment depends on their specificity, *see Conroy, supra,* 98 *N.J.* at 363, their "remoteness, consistency and thoughtfulness ... [,] and the maturity of the person at the time of the statements...." *Id.* at 362. All of the statements about life-support that were attributed to Mrs. Jobes were remote, general, spontaneous, and made in casual circumstances. Indeed, they closely track the examples of evidence that we have explicitly characterized as unreliable. *See id.* at 362–63 (negating probative value of "an off-hand remark about not wanting to live under certain circumstances made by a person when young and in the peak of health"); *id.* at 366 (noting that "informally expressed reactions to other people's medical condition and treatment" do not constitute clear proof of a patient's intent).

Other than her prior statements, the only evidence of Mrs. Jobes' intent that the trial court relied on was her membership in the Presbyterian Church. There is no specific evidence of her personal belief in the tenets of that Church; nevertheless, we have consistently recognized that "a person's religious affiliation and the tenets of that religion may furnish evidence of his or her intent with regard to medical decisions." *Conroy, supra,* 98 *N.J.* at 362; *see Quinlan, supra,* 70 *N.J.* at 30–31. In this case, however, Mrs. Jobes' minister testified that her religion neither requires nor forbids medical treatment like that at issue here. Therefore, Mrs. Jobes' religious affiliation does not offer much guidance in determining what her preference would be in this situation.

Thus, we conclude that although there is some "trustworthy" evidence that Mrs. Jobes, if competent, would want the j-tube withdrawn [8], it is not sufficiently "clear and convincing" to

---

[8]The consistency of Mrs. Jobes' statements does give them some force.

satisfy the subjective test. Therefore, we must determine the guidelines and procedures under which life-sustaining medical treatment may be withdrawn from a patient like Mrs. Jobes when there is no clear and convincing proof of her attitude toward such treatment.

## VI

Because of the unique problems involved in decisionmaking for any patient in the persistent vegetative state, we necessarily distinguish their cases from cases involving other patients. Accordingly, in *Peter* we held that neither the life-expectancy test nor the balancing tests set forth in *Conroy* are appropriate in the case of a persistently vegetative patient. *See Peter, supra,* 108 *N.J.* at 374–376. Those holdings are equally relevant in this case. In any case involving a patient in the persistent vegetative state, "we look instead primarily to *Quinlan* for guidance." *Id.* at 376.

Karen Quinlan was twenty-two years old and hospitalized in an irreversible vegetative state when her father sought authorization to withdraw the respirator that was thought to be sustaining her.[9] We began our analysis of his request by recognizing that "if Karen were herself miraculously lucid for an interval (not altering the existing prognosis of the condition to which she would soon return) and perceptive of her irreversible condition, she could effectively decide upon discontinuance of the life-support apparatus, even if it meant the prospect of natural death." *Quinlan, supra,* 70 *N.J.* at 39. We realized that the state had potential interests in prolonging any individual's life. We explained, however, that those interests weaken

---

[9]Two medical ethicists who testified in this case disagreed over whether there is a meaningful distinction between withdrawing nasogastric tubes and other life sustaining medical treatment like respirators. For the reasons we stated in *In re Conroy, supra,* 98 *N.J.* at 372–73, and affirm today in *In re Peter, supra,* 108 *N.J.* at 380–382, we reject such a distinction.

and the individual's right to privacy becomes stronger "as the degree of bodily invasion [effected by the medical treatment at issue] increases and the prognosis [for recovery to a cognitive, sapient state] dims." 70 *N.J.* at 41. We concluded that Karen Quinlan's right to choose whether to consent to or refuse life-support outweighed any relevant state interests. Our confidence in that conclusion has not been undermined by our subsequent articulation of the four specific state interests which are generally relevant in cases of this type. *See Farrell, supra*, 108 *N.J.* at 349–354; *Conroy, supra*, 98 *N.J.* at 348–49. We "find it difficult to conceive of a case in which the State could have an interest strong enough to subordinate a patient's right to choose not to be sustained in a persistent vegetative state." *Peter, supra*, 108 *N.J.* at 380.

■ In light of Karen Quinlan's inability to assert her right to decline continued artificial respiration, we determined that "[t]he only practical way to prevent destruction of the right [was] to permit the guardian and family of Karen to render their best judgment, subject to the qualifications [t]hereinafter stated, as to whether she would exercise it in [her] circumstances." 70 *N.J.* at 41. The term "substituted judgment" is commonly used to describe our approach in *Quinlan*. *See President's Commission Report, supra*, at 136; N. Cantor, *Legal Frontiers of Death and Dying* 79 (1987). This approach is intended to ensure that the surrogate decisionmaker effectuates as much as possible the decision that the incompetent patient would make if he or she were competent. Under the substituted judgment doctrine, where an incompetent's wishes are not clearly expressed, a surrogate decisionmaker considers the patient's personal value system for guidance. The surrogate considers the patient's prior statements about and reactions to medical issues, and all the facets of the patient's

personality that the surrogate is familiar with [10]—with, of course, particular reference to his or her relevant philosophical, theological, and ethical values—in order to extrapolate what course of medical treatment the patient would choose. *See In re Roe*, 383 *Mass.* 415, 442, 421 *N.E.*2d 40, 56–59 (1981).

In *Quinlan* we held that the patient's family members were the proper parties to make a substituted medical judgment on her behalf. *See Quinlan, supra*, 70 *N.J.* at 41. We make the same determination today. Almost invariably the patient's family has an intimate understanding of the patient's medical attitudes and general world view and therefore is in the best position to know the motives and considerations that would control the patient's medical decisions.

> [E]ven if no prior specific statements were made, in the context of the individual's entire prior mental life, including his or her philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures,. suffering and death, that individual's likely treatment/nontreatment preferences can be discovered. Family members are most familiar with this entire life context. Articulating such knowledge is a formidable task, requiring a literary skill beyond the capacity of many, perhaps most, families. But the family's knowledge exists nevertheless, intuitively felt by them and available as an important decisionmaking tool.

[10]For example, a surrogate decisionmaker might consider the patient's likely attitude toward the impact of his or her choice of medical treatment on his or her loved ones:

> An individual who is part of a closely knit family would doubtless take into account the impact his acceptance or refusal of treatment would likely have on his family. Such a factor is likewise to be considered in determining the probable wishes of one who is incapable of formulating or expressing them himself. In any choice between proposed treatments which entail grossly different expenditures of time or money by the incompetent's family, it would be appropriate to consider whether a factor in the incompetent's decision would have been the desire to minimize the burden on his family.

[*In re Roe*, 383 *Mass.* 415, 446, 421 *N.E.*2d 40, 58 (1981).]

However, as the court in *Roe* noted, the surrogate "must be careful to avoid examination of [this consideration] in any manner other than one designed and intended to effectuate the individual's right to self-determination." *Id.*

[Newman, *Treatment Refusals for the Critically Ill: Proposed Rules for the Family, the Physician and the State,* III *N.Y.L.Sch.* Human Rights Annual 45–46 (1985).]

Family members are best qualified to make substituted judgments for incompetent patients not only because of their peculiar grasp of the patient's approach to life, but also because of their special bonds with him or her. Our common human experience informs us that family members are generally most concerned with the welfare of a patient. It is they who provide for the patient's comfort, care, and best interests, *see id.* at 35, 355 *A.2d* 647; *see Farrell, supra,* 108 *N.J.* at 355, and they who treat the patient as a person, rather than a symbol of a cause. Where strong and emotional opinions and proponents exist on an issue involving the treatment of an incompetent, extreme care must be exercised in determining who will act as his or her surrogate decisionmaker. We believe that a family member is generally the best choice.

As we stated in *Farrell:*

Our common human experience teaches us that family and close friends care most and best for a patient. They offer love and support and concern, and have the best interest of the patient at heart. The importance of the family in medical treatment decisions is axiomatic.

[F]amilies commonly exhibit the greatest degree of concern about the welfare of ailing family members. It is they who come to the hospital and involve themselves in the sick person's care and comfort. Competent patients usually actively solicit the advice and counsel of family members in decision-making. Family members routinely ask questions of the medical staff about the patient's condition and prognosis; one study found they frequently asked more questions than patients themselves did. Family members, in fact, commonly act as advocates for patients in the hospital, looking out for their comfort, care, and best interests. . . .

[Newman, *Treatment Refusals for the Critically Ill: Proposed Rules for Family, the Physician and the State,* III *N.Y.L.Sch.* Human Rights Annual 35 (1985).]

*See generally* Dyck, *Self-determination and Moral Responsibility,* 9 W.New Eng.L.Rev. 53, 55–60 (1987) (discussing family involvement in medical decisions in the context of the doctrine of self-determination).

The law has traditionally respected the private realm of family life which the state cannot enter. . . . We believe that this tradition of respect for and confidence in the family should ground our approach to the treatment of the sick.

[*Farrell, supra,* 108 *N.J.* at 355 (citation edited).]

Other courts have agreed that the family's substituted judgment is the best guide in cases where the patient's intention to accept or refuse life-sustaining treatment has not been clearly established. *See, e.g., Barber v. Superior Court,* 147 *Cal.App.* 3d 1006, 1021, 195 *Cal.Rptr.* 484, 492 (Cal.Ct.App.1983); *Foody v. Manchester Memorial Hosp.,* 40 *Conn.Supp.* 127, 482 *A.*2d 713 (Superior Ct. 1984); *John F. Kennedy Memorial Hosp. v. Bludworth,* 452 *So.*2d 921, 926 (Fla.1984); *In re Torres,* 357 *N.W.*2d 332 at 341 n. 4 (Minn.1984); *Leach v. Akron General Medical Center,* 426 *N.E.*2d 809 (Ohio Com.Pl.1980); *In re Colyer,* 99 *Wash.*2d 114, 660 *P.*2d 738 (1983).

Medical authorities also have recognized that family members are the appropriate surrogate decisionmakers for incompetent patients. The President's Commission, for example, specifically concluded:

The decisions of patients' families should determine what sort of medical care permanently unconscious patients [who have not left clear directives] receive. Other than requiring appropriate decisionmaking procedures for these patients, the law does not and should not require any particular therapies to be applied or continued, with the exception of basic nursing care that is needed to ensure dignified and respectful treatment of the patient.

[*President's Commission Report, supra,* at 4–5.]

*See also New Jersey Chapter of the American College of Physicians Executive Council Policy Statement on Care of Irreversibly Ill Patients* (Oct. 1986) ("Family members are presumed to be the appropriate surrogate decisionmakers for patients diagnosed as being incapable of giving informed consent."); *Statement of the Council on Ethical and Judicial Affairs of the American Medical Association on Withholding or Withdrawing Life Prolonging Medical Treatment* (Mar. 15, 1986) ("[T]he choice of the patient, or his family or legal representative if the patient is incompetent to act on his own behalf, should prevail."); Los Angeles County Medical and Bar Associations, *Principles and Guidelines Concerning the Foregoing of Life Sustaining Treatment For Adult Patients* 1

(July 17, 1985) ("Immediate family members or close friends . . . are the surrogate decisionmakers.")

Our review of these cases and medical authorities confirms our conclusion that we should continue to defer, as we did in *Quinlan*, to family members' substituted judgments about medical treatment for irreversibly vegetative patients who did not clearly express their medical preferences while they were competent.[11] Those decisions are best made by the family

---

[11]Public opinion also appears to support the substituted judgment approach to surrogate decisionmaking. Public opinion is relevant in the withdrawal-of-treatment cases that we decide today because they present society with moral, social, technological, and philosophical problems that transcend legal issues. *See* Chief Justice Joseph Weintraub Lecture by Justice Alan B. Handler at Rutgers Law School (March 11, 1987), 119 *N.J.L.J.* 482 (March 19, 1987); *see also Peter, supra,* 108 *N.J.* at 385; *Farrell, supra,* 108 *N.J.* at 341–343; *Conroy, supra,* 98 *N.J.* at 344 (discussing the need for a legislative resolution of these complicated problems); *Quinlan, supra,* 70 *N.J.* at 44 (noting the relevance of "the common moral judgment of the community at large" in cases of this type). Every recent survey that we have found indicates that society believes that a patient's family members should function as his or her surrogate decisionmakers. In a recent Star Ledger/Eagleton Poll, 84% of the 800 New Jersey residents interviewed felt that a family should be allowed to discontinue treatment for someone "in a coma with no chance of recovery" who is "being kept alive by machines" if the patient had said he or she did not want such treatment; and 64% said the family should be allowed to discontinue treatment under these circumstances even if the patient had said nothing, but the family members nevertheless believe he or she would not want to be sustained in his or her medical condition. Newark Star Ledger, Aug. 10, 1986, at 18, col. 4.

In a nationwide poll conducted in May and June of 1986, 73% of the 1510 respondents approved "withdrawing life support systems, including food and water, from a hopelessly ill patient if they or their family request it." *See* N.Y. Times, Nov. 29, 1986, at 32, col. 1–6. Even more recently, 70% of the 2000 persons from across the nation who participated via television in a conference on life-sustaining medical treatment at the United States Chamber of Commerce in Washington, D.C., during the fall of 1986 "strongly agreed" that family members should decide whether to use life-sustaining medical treatment for patients who are unable to choose for themselves. *See* N.Y. Times, Dec. 2, 1986, at C10, col. 2–6.

These surveys also indicate that our society overwhelmingly endorses the competent patient's right to refuse life-sustaining treatment which, as we have explained, grounds our holding in this case. *See id.* (90%); N.Y. Times, Nov. 29, 1986, *supra,* at 32, col. 1–6 (73%); Newark Star Ledger, *supra,* Aug. 10,

because the family is best able to decide what the patient would want.

Normally those family members close enough to make a substituted judgment would be a spouse, parents, adult children, or siblings.  Generally in the absence of such a close degree of kinship, we would not countenance health care professionals deferring to the relatives of a patient, and a guardian would have to be appointed.  However, if the attending health care professionals determine that another relative, e.g., a cousin, aunt, uncle, niece, or nephew, functions in the role of the patient's nuclear family, then that relative can and should be treated as a close and caring family member. *See In re Farrell, supra*, 108 *N.J.* at 355 (noting the conspicuous presence of family members vis-a-vis health care professionals).

There will, of course, be some unfortunate situations in which family members will not act to protect a patient.  We anticipate that such cases will be exceptional.  Whenever a health-care professional becomes uncertain about whether family members are properly protecting a patient's interests, termination of life-sustaining treatment should not occur without the appointment of a guardian.

We realize that there may be rare situations where a health-care professional's assessment of a family situation proves to be wrong.  In such a case, if the professional has made a good faith determination in this regard, he or she will not be subject to any criminal or civil liability.

Mrs. Jobes is blessed with warm, close, and loving family members.  It is entirely proper to assume that they are best qualified to determine the medical decisions she would make. Moreover, there is some trustworthy evidence that supports

---

1986, at 18, col. 4 (88%); *see also* Cleveland Plain Dealer, March 4, 1985, at 1A, col. 1–4 (85% of nationwide survey of 1250 adults); N.Y. Times, Sept. 23, 1984, at 56, col. 3–4 (72% of 1600 Americans surveyed); *cf.* N.Y. Times, March 17, 1985, at 38, col. 4–5 (81% of 1500 adults nationwide agreed with *Conroy* ruling).

their judgment of Mrs. Jobes' personal inclinations. Therefore, we will not presume to disturb their decision.

▓▓▓▓ Thus, we hold that the right of a patient in an irreversibly vegetative state to determine whether to refuse life-sustaining medical treatment may be exercised by the patient's family or close friend. If there are close and caring family members who are willing to make this decision there is no need to have a guardian appointed. We require merely that the responsible relatives comply with the medical confirmation procedures that we henceforth establish. *See infra* at 420-421. If there are no close family members, and the patient has not left clear and convincing evidence that he or she intended another relative or a nonrelative friend to make surrogate medical decisions in the case of his or her incompetency, *see, e.g., Peter, supra,* 108 *N.J.* at 370 (where patient gave her friend durable power of attorney to make medical decisions), then a guardian must be appointed [12] and comply with the following procedural requirements. *Cf. id.* at 384.

## VII

In *Quinlan,* we realized that in the absence of legislation, the responsibility of establishing procedural guidelines for the effectuation of decisions to withdraw life-support is incumbent upon the court. Therefore, we held that when the guardian, the family, and the attending physician concur that life support should be withdrawn from a hospital patient in a persistent vegetative state, they must secure the confirmation of a hospital prognosis committee that there is no reasonable possibility

---

[12]In many cases, an application for the appointment of a medical guardian can be integrated into routine fiduciary guardianship proceedings. When a court considers an application for guardianship, it can also consider whether the proposed guardian will be the appropriate person (i.e., close family member or friend) to make future medical decisions for the ward. Thus, in many cases at the difficult juncture when important medical decisions must be made about an incompetent's medical treatment, no further judicial intervention would be necessary.

that the patient might recover to a cognitive sapient state. *See Quinlan, supra,* 70 *N.J.* at 50. Once such a confirmation is secured, the life-supporting treatment may be withdrawn. *Id. Quinlan* specifically rejected any provision for judicial review of this procedure as unnecessary and "impossibly cumbersome." *See Id.*

*Amicus* New Jersey Hospital Association has informed us that since *Quinlan* was decided, approximately eighty-five percent of New Jersey's acute-care hospitals have established prognosis committees that check the attending physician's prognosis when withdrawal of life support from a vegetative patient is under consideration. Thus it appears that the *Quinlan* procedure is functioning in the setting for which it was intended.

Mrs. Jobes, of course, is in a nursing home rather than a hospital. We believe, however, that the processes of surrogate decisionmaking should be substantially the same regardless of where the patient is located. Otherwise, the patient's right to determine his or her medical treatment could be frustrated by an irrelevant factor. Nevertheless, we recognize there are safeguards in a hospital that are usually not present in a nursing home, i.e., the hospital patient normally has his or her own attending physician [13] and, as noted above, many hospitals have prognosis committees.[14] The lack of these safeguards was among the reasons that we developed the Ombudsman procedures that protect elderly nursing home patients. *See*

---

[13]By "attending physician" we mean the personal, treating physician of the patient. Unlike an institutional staff physician, the attending physician would be familiar with the patient and, presumably, with the patient's family.

[14]Because it would be helpful whenever life-sustaining treatment has been declined on behalf of a patient in the persistent vegetative state, nursing homes should consider affiliating with the prognosis committees of nearby hospitals. "The Department of Health also might consider the feasibility of developing regional prognosis committees for nursing homes." *Peter, supra,* 108 *N.J.* at 383 n. 13.

*Conroy, supra,* 98 *N.J.* at 375–76; *Peter, supra,* 108 *N.J.* at 383.

■ Because Mrs. Jobes is not elderly, the Ombudsman does not have jurisdiction over her case. *See N.J.S.A.* 52:27G–1, 2(i) (Ombudsman has jurisdiction only in cases where the patient is at least sixty years old). Fortunately, Mrs. Jobes is not in the vulnerable predicament that so many elderly nursing home patients are in because she has a caring and responsible family. For non-elderly non-hospitalized patients in a persistent vegetative state who, like Mrs. Jobes, have a caring family or close friend, or a court-appointed guardian in attendance, we hold that the surrogate decisionmaker who declines life-sustaining medical treatment must secure statements from at least two independent physicians knowledgeable in neurology that the patient is in a persistent vegetative state and that there is no reasonable possibility that the patient will ever recover to a cognitive, sapient state. If the patient has an attending physician, then that physician likewise must submit such a statement. These independent neurological confirmations will substitute for the concurrence of the prognosis committee for patients who are not in a hospital setting and thereby prevent inappropriate withdrawal of treatment. In a proper case, however, they should not be difficult to obtain, and this requirement should not subject the patient to undesired treatment.

■ As long as the guidelines we hereby establish are followed in good faith,[15] no criminal or civil liability will attach to

---

[15]Physicians and other health-care personnel are under an ethical, moral, and legal duty to act in good faith and not to deviate from approved medical standards. Physicians who do not adhere to these rules and standards open themselves to potential civil and criminal liability. This fear of liability is substantial, *see, e.g., In re Barber,* 147 *Cal.App.*3d 1006, 195 *Cal.Rptr.* 484 (Cal.Ct.App.1983) (Two doctors who acceded to the requests of family of patient in persistent vegetative state by removing his respirator and feeding tube were charged with murder and conspiracy to commit murder.), and should operate to ensure that the procedures we establish today will be followed.

anyone involved in the implementation of a surrogate decision to decline medical treatment. Accordingly, judicial review of such decisions is not necessary or appropriate.[16] As we have explained, patients and their families may suffer when the courts become involved in their sensitive and personal medical decisions:

> No matter how expedited, judicial intervention in this complex and sensitive area may take too long. Thus, it could infringe the very rights that we want to protect. The mere prospect of a cumbersome, intrusive and expensive court proceeding, during such an emotional and upsetting period in the lives of a patient and his or her loved ones, would undoubtedly deter many persons from deciding to discontinue treatment. And even if the patient or the family were willing to submit to such a proceeding, it is likely that the patient's rights would nevertheless be frustrated by judicial deliberation. Too many patients have died before their right to reject treatment was vindicated in court. *See, e.g., Conroy, supra,* 98 *N.J.* at 342; *Bartling* [*v. Superior Court for County of Los Angeles,*] *supra,* 163 *Cal.App.*3d [186] at 190, 209 *Cal.Rptr.* [220] at 221 (1984); *John F. Kennedy Memorial Hosp. v. Bludworth,* 452 *So.*2d 921, 923 (Fla.1984); *Satz v. Perlmutter, supra,* 379 *So.*2d 359; *Corbett v. D'Alessandro,* 487 *So.*2d 368, 369 (Fla.Dist.Ct.App.) review denied, 492 *So.*2d 1331 (Fla.1986); *In re L.H.R.,* 253 *Ga.* 439, 321 *S.E.*2d 716 (1984); *In re Spring,* 380 *Mass.* 629, [631] n. 1, 405 *N.E.*2d 115, 118 n. 1 (1980); *Saikewicz, supra,* 373 `Mass.` at [734], 370 *N.E.*2d at 422; *In re Storar,* 52 *N.Y.*2d 363, [369] n. 1, 420 *N.E.*2d 64, 66 n. 1, 438 N.Y.S.2d 266, [268] n. 1, *cert.* denied, 454 *U.S.* 858 [102 *S.Ct.* 309] [70] *L.Ed.* 2d [153] (1981); *In re Hamlin, supra,* 102 *Wash.*2d at [811], 689 *P.*2d at 1374. [*In re Farrell, supra,* 108 *N.J.* at 357.]

Of course, if there is a dispute among the members of a patient's family, the guardian and the physicians, any interested party can invoke judicial aid to insure that the guidelines we

---

16We specifically disapprove any interpretations of *R.* 4:83–12, which allows "a hospital, nursing home, treating physicians, relative or other appropriate person" to apply for the appointment of a special medical guardian to consent to emergency treatment when a patient is unable to give consent, that would frustrate the tenor of this opinion. By its own terms, *R.* 4:83–12 is to be invoked only when "the prompt rendering of medical treatment is necessary in order to deal with a substantial threat to the patient's life or health." When a decision that a certain course of medical treatment is not necessary is made in accordance with the guidelines that we have established, *R.* 4:83–12 is inapposite with regard to that course of treatment.

have established are properly followed and that the patient is protected.[17]

The "substituted judgment" approach to decisionmaking for patients in the persistent vegetative state is our ideal. We realize that in some cases it may be unworkable, *e.g.*, when the patient has always been incompetent, *see President's Commission Report, supra,* at 132–33 ("The substituted judgment standard can be used only if a patient was once capable of developing views relevant to the matter at hand."), or when the patient has no family or close friends in a position to know his or her subjective personality. *See Conroy, supra,* 98 *N.J.* at 375 (noting the social isolation of many nursing home patients). We need not and therefore do not decide those cases today. As Justice Schreiber explained in *Conroy:*

> We have not attempted to set forth guidelines for decisionmaking with respect to life-sustaining treatment in a variety of other situations that are not currently before us. Innumerable variations are possible. However, each case—such as that of the severely deformed newborn, of the never-competent adult suffering from a painful and debilitating illness, and of the mentally alert quadriplegic who has given up on life—poses its own unique difficulties. We do not deem it advisable to attempt to resolve all such human dilemmas in the context of this case. It is preferable, in our view, to move slowly and to gain experience in this highly sensitive field. As we noted previously, the Legislature is better equipped than we to develop and frame a comprehensive plan for resolving these problems.
>
> [*Id.* at 387–88.]

*See also Farrell, supra,* 108 *N.J.* at 360–362 (O'Hern, J., concurring).

## VIII

■ The trial court held that the nursing home could refuse to participate in the withdrawal of the j-tube by keeping Mrs. Jobes connected to it until she is transferred out of that facili-

---

[17]Even when judicial intervention is proper, the trial court's decision need not and should not always be appealed.

ty.[18]  Under the circumstances of this case, we disagree, and we reverse that portion of the trial court's order.

Mrs. Jobes' family had no reason to believe that they were surrendering the right to choose among medical alternatives when they placed her in the nursing home. *See N.J.S.A.* 30:13–5(m) (nursing home residents may not be deprived of constitutional, civil, or legal rights solely by reason of their admission to a nursing home).  The nursing home apparently did not inform Mrs. Jobes' family about its policy toward artificial feeding until May of 1985 when they requested that the j-tube be withdrawn.  In fact there is no indication that this policy has ever been formalized.  Under these circumstances Mrs. Jobes and her family were entitled to rely on the nursing home's willingness to defer to their choice among courses of medical treatment. *See In re Requena,* 213 *N.J.Super.* 443 (App.Div.), *aff'g* 213 *N.J.Super.* 475 (Ch.Div.1986) (subverting a hospital's policy not to participate in the withholding or withdrawal of artificial feeding where long-term patient had no notice of it prior to her decision to forgo such treatment).

We do not decide the case in which a nursing home gave notice of its policy not to participate in the withdrawal or withholding of artificial feeding at the time of a patient's admission.  Thus, we do not hold that such a policy is never enforceable.  But we are confident in this case that it would be wrong to allow the nursing home to discharge Mrs. Jobes.  The evidence indicates that at this point it would be extremely difficult, perhaps impossible, to find another facility that would accept Mrs. Jobes as a patient.  Therefore, to allow the nursing home to discharge Mrs. Jobes if her family does not consent to continued artificial feeding would essentially frustrate Mrs. Jobes' right of self-determination. *See generally* Annas,

---

[18]Mr. Jobes did not argue against this portion of the trial court order in his brief or at oral argument.  Nevertheless, his appeal to this court must be construed as relating to it because the rest of the trial court's order is in consonance with his position that Mrs. Jobes' j-tube may be removed.

"Transferring the Ethical Hot Potato," 17 Hastings Center Report 20–21 (Feb.1987) (explaining how patients' rights are threatened by legal decisions that allow medical institutions to discharge "patients who do not accept everything they offer").

Throughout the six years that Mrs. Jobes has been at the nursing home she has received extraordinary attention and tender care. We are confident that this excellent treatment will continue. "A decision to forego life-sustaining treatment is not a ground to withdraw all care—nor should care givers treat it in this way...." *President's Commission Report, supra,* at 90. Health care professionals must provide for the comfort and dignity of "people who choose to forego life-sustaining therapy or for whom no such therapies are available." *Id.* at 4. Their specific obligations depend, of course, on the condition and treatment preferences of the individuals they attend. Certainly, however, "hygenic measures and dignified care for the body" are necessary in every case. *Id.* at 189; *see also Farrell, supra,* 108 *N.J.* at 364–365 (O'Hern, J., concurring). Thus, we recognize that our decision will be burdensome for some of the nursing home personnel. Nevertheless, in view of the immense hardship that would fall on Mrs. Jobes and her family if she were forced out of the nursing home, we are compelled to impose on it for her continued care.

## IX

In the trilogy of cases that we have decided today, *In re Farrell, supra,* 108 *N.J.* 335, *In re Peter, supra,* 108 *N.J.* 365, and this case, *In re Jobes,* we have formulated guidelines and procedures under which life-sustaining medical treatment (including artificial feeding) may be withdrawn from a competent patient at home, and from two nursing home patients, one elderly and one non-elderly, both of whom are in a persistent vegetative state.

In summary, we state again that the fateful decision to withdraw life-supporting treatment is extremely person-

al. Accordingly, a competent patient's right to make that decision generally will outweigh any countervailing state interests. *See Farrell, supra,* 108 *N.J.* at 354. An incompetent patient does not lose his or her right to refuse life-sustaining treatment. Where such a patient has clearly expressed her intentions about medical treatment, they will be respected. *Peter, supra,* 108 *N.J.* at 378.

Where an irreversibly vegetative patient like Mrs. Jobes has not clearly expressed her intentions with respect to medical treatment, the *Quinlan* "substituted judgment" approach best accomplishes the goal of having the patient make her own decision. In most cases in which the "substituted judgment" doctrine is applied, the surrogate decisionmaker will be a family member or close friend of the patient. Generally it is the patient's family or other loved ones who support and care for the patient, and who best understand the patient's personal values and beliefs. Hence they will be best able to make a substituted medical judgment for the patient.

The location of the patient should occasion minimal interference with the patient's right, expressed either directly or through a surrogate decisionmaker, to determine his or her treatment. Particularly at the present time—when terminal and vegetative patients are not permitted to remain in hospitals—we prefer not to impose extra restrictions on the withdrawal of treatment because the patient is at home or in a nursing home. Nevertheless, we recognize that generally, because of the presence of attending physicians and prognosis committees, hospitals afford greater protection against the premature termination or undue prolongation of life-support measures. We believe that the procedures of independent medical verification that we establish today adequately protect patients, without unduly burdening their rights to self-determination and privacy.

If a disagreement arises among the patient, family, guardian, or doctors, or if there is evidence of improper motives or

malpractice, judicial intervention will be required. We expect, however, that disagreements will be rare and that intervention seldom will be necessary. We emphasize that even in those few cases in which the courts may have to intervene, they will not be making the ultimate decision whether to terminate medical treatment. Rather, they will be acting to insure that all the guidelines and procedures that we have set forth are properly followed.

Courts are not the proper place to resolve the agonizing personal problems that underlie these cases. Our legal system cannot replace the more intimate struggle that must be borne by the patient, those caring for the patient, and those who care about the patient.

The challenge for the courts will be to evolve innovative and flexible processes by which affected individuals can participate comfortably and confidently to secure the vindication of the interests we all seek to protect. [Chief Justice Joseph Weintraub Lecture by Justice Alan B. Handler at Rutgers Law School (March 11, 1987), 119 *N.J.L.J.* 482 (March 19, 1987).]

Ideally, each person should set forth his or her intentions with respect to life-supporting treatment. This insures that the patient's own resolution of this extraordinarily personal issue will be honored. Failure to express one's intentions imposes an awesome and painful responsibility on the surrogate decision-maker.

As we have previously explained, the Legislature is better equipped than the judiciary to frame comprehensive guidelines and procedures for the withdrawal of life-sustaining treatment. Accordingly, we urge it to pass legislation in this area.

As modified, we affirm the judgment of the trial court.

HANDLER, J., concurring.[1]

I join fully in the reasoning and the result of the majority opinions in this case and in the related cases of *In re Farrell*,

---

[1] This concurring opinion applies as well to *In re Farrell*, 108 *N.J.* 335 (1987) and *In re Peter*, 108 *N.J.* 365 (1987).

108 *N.J.* 335 (1987) and *In re Peter*, 108 *N.J.* 365 (1987). The Court establishes standards for right-to-die cases, which commendably balance the many rights, interests, and concerns present in these cases. I write separately to express more fully my understanding of the court's essential rulings. These cases, soundly decided in my view, bring us to the threshold of other issues for which the decisional standards posited by the Court may not yield sufficient direction or adequate guidance. Because our decisions so clearly raise additional and inevitable concerns, some further exploration and explication of governing principles are needed.

The decisional chore in these cases is especially difficult because they bring into question the role of courts and, indeed, the role and limits of law. The cases evoke strong emotional reactions, which must be acknowledged as we come to grips with the merits of the controversies. These appeals reinforce the feeling that many of the troubling issues in the right-to-die cases are intrinsic to the human condition and thus are not susceptible to judicial resolution. We may believe that the judicial role in dealing with these tragic individual and social dilemmas should remain confined. These concerns impel me to write separately, adding some thoughts to the Court's important rulings.

## I.

Among the cases we decide today is that of Nancy Ellen Jobes, a case which involves most of the legal, conceptual, and philosophical problems that pervade right-to-die litigation. Mrs. Jobes is thirty-one years old. Because of a complication during a March 1980 surgery, she suffered massive and irreversible brain damage. Since that time, she has been in a permanent vegetative state and, since July 1980, she has been cared for in a nursing home. No one would fail to characterize the extensive treatment that serves to keep her in a biologically-viable condition as extraordinary and heroic. *See infra* pages 441–42.

In May 1985, Mrs. Jobes' husband and parents asked the nursing home to terminate this treatment, specifically to withdraw the jejunostomy tube through which Mrs. Jobes receives nutrients. The nursing home refused. Mr. Jobes then sought judicial authorization to discontinue his wife's treatment.

Today this Court holds that though Mrs. Jobes' intention to accept or refuse life-sustaining treatment has not been clearly established by clear and convincing evidence, the Court will uphold the decision of close family members who made the treatment determination based on what they believe Mrs. Jobes' would have decided. *Ante* at 418–420. The Court is satisfied to effectuate the decision of the patient's family. It has in these circumstances adopted the individual right of self-determination reflected by the substituted judgment of a surrogate decisionmaker as the standard for resolving the fundamental issue of whether to terminate life-sustaining treatment.

While this "substituted judgment" standard fits well the facts of this case, the Court notes that in many cases this standard will not be workable, *e.g.*, in cases where the patient has always been incompetent or when there is no one sufficiently familiar with the patient to be able to know how the patient would have decided. *Ante* at 424. The Court does not suggest standards for how treatment decisions should be made in such cases. *Id.* I would add that there will be difficult cases in which the relationship of family members or putative friends of the patient may not be close enough for them to be an appropriate source for the awesome decision of whether to discontinue life-perpetuating treatment.

In the cases now before the Court, the decision to discontinue or to refuse treatment was either made by the patient herself or made by the patient's guardian on the basis of trustworthy evidence of what the patient would have decided. However, the facts of these cases foreshadow situations in which society and

the judicial system will be confronted with treatment decisions that are morally even more intractable. The difficult extreme case, where there is no basis for deciding what choice the patient would have wanted made, is not before the Court now, but it would be naive to believe that we will not face this difficult question in the near future.[2] At the same time, what we decide today may strongly influence our decisions in later cases. The standard that we adopt in these cases may serve either to clarify or obfuscate the decisions we will be called upon to make in later variant cases. *Compare In re Quinlan,* 70 *N.J.* 10 (1976) *with Matter of Conroy,* 98 *N.J.* 321 (1985).

In the absence of legislative direction, the courts will have to find some criteria, some values upon which to authorize or refuse authorization for treatment decisions in contexts where we have no basis for predicting what decision an incompetent patient would have wanted made. We must be alert to the possibility of abuse and understand that in this context, "abuse" includes not only discontinuing treatment for a patient who would have wanted treatment continued, but also the continuation of treatment for a patient who would have wanted treatment stopped. As we observed in *Conroy, supra,* 98 *N.J.* at 343: "To err either way—to keep a person alive under circumstances under which he would rather have been allowed to die, or to allow that person to die when he would have chosen to live—would be deeply unfortunate." The courts must find an approach that confronts both forms of potential abuse, while minimizing the possibility of either.

---

[2] *Cf. Matter of Guardianship of Hamlin,* 102 *Wash.*2d 810, 689 *P.*2d 1372 (1984) (treatment decision for severely retarded patient in chronic vegetative state; patient had no family, relatives or close friends); *In re L.H.R.,* 253 *Ga.* 439, 321 *S.E.*2d 716 (1984) (treatment decision for infant in chronic vegetative state); *Matter of Storar,* 52 *N.Y.*2d 363, 438 *N.Y.S.*2d 266, 420 *N.E.*2d 64 (1981), *rev'g,* 78 *A.D.*2d 1013, 434 *N.Y.S.*2d 46 (1980) (treatment decision for terminally ill patient severely mentally retarded since birth); *Superintendent of Belchertown v. Saikewicz,* 373 *Mass.* 728, 370 *N.E.*2d 417 (1977) (treatment decision for older adult severely mentally retarded since birth).

We can start by examining more critically the concept of self-determination as the primary or preferred basis for such treatment decisions and then explore the relationship between self-determination and other important criteria encompassed generally by the concept of patient best-interests for informing treatment decisions. These inquiries inevitably confront us with serious questions relating to the judicial role in this area of acute individual and social concerns.

## II.

The foundation for our decisions is the concept of individual self-determination. The objective of legislative and judicial action in medical treatment decisions has been to insure that, to the extent possible, the patient's right to self-determination is protected. The right to self-determination has been described as an individual's "strong[ ] personal interest in directing the course of his own life", "an individual's right to behave and act as he deems fit, provided that such behavior and activity do not conflict with the precepts of society." *Conroy, supra,* 98 *N.J.* at 350, 358. In *Quinlan,* while the underlying interest was denominated as a constitutional right of privacy rather than the common-law right of self-determination, the core notion—the primacy of individual choice—was essentially the same.[3]

"Self-determination" is not a monolithic concept; it embraces a cluster of values or interests associated with individual autonomy. In medical treatment decisions, the law developed the doctrine of informed consent as the primary means for protect-

---

[3]The *Quinlan* court may have been mistaken in its choice to base the decision on constitutional grounds. *See Quinlan, supra,* 70 *N.J.* at 38–42. "Viewed as a prod to intensive legislative consideration, the decision's guidelines seem defensible. But by casting its holding in federal constitutional terms, the New Jersey court may have needlessly foreclosed more intelligent legislative solutions in that state." L. Tribe, *American Constitutional Law* § 15–11, at 937 (1978) (footnotes omitted). The *Conroy* decision was based on common law foundations, *Conroy, supra,* 98 *N.J.* at 348, and thus the standards promulgated were left open to judicial and legislative modification.

ing the right of self-determination. "The doctrine of informed consent [requires that medical decisions be made in a context where] the patient has the information necessary to evaluate the risks and benefits of all the available options and is competent to do so." *Conroy, supra,* 98 *N.J.* at 347. Self-determination in its purest form thus includes elements of knowledge and volition.[4] This understanding of individual self-determination is illustrated by the companion case of *Farrell, supra.*

The assurances and safeguards used to protect and effectuate a competent patient's self-determination primarily through informed consent are not available when the patient whose treatment decision is at question is no longer competent. Serious conceptual and practical difficulties arise when we try to apply to incompetent persons the standards used to promote the value of self-determination for competent persons. *See In re Grady,* 85 *N.J.* 235 (1981). In the process, we are necessarily remitted to a decision or judgment that falls short of true individual self-determination.

The cases we presently consider dramatize the paradox in transporting the concepts of self-determination from competent to incompetent persons. The difficulty can be measured by the differences between the *Farrell* case and the *Jobes* and *Peter* cases. The record in Kathleen Farrell's case elaborately documented that her decision expressed her right of self-determi-

---

[4]Voluntariness is itself a difficult concept. The line between motivations we consider normal and legitimate and those we consider distorting or coercive is not always clear. If a patient refusing medical treatment is depressed, should that asserted choice be disregarded because the patient might change her mind when she overcomes her depression? *See Bartling v. Super. Ct.,* 163 *Cal.App.*3d 186, 209 *Cal.Rptr.* 220, 223–24 (1984). Should we respect the wishes of a patient who makes a treatment decision based partly on the pain her suffering brings her family? *Cf. Bouvia v. Superior Court,* 179 *Cal.App.*3d 1127, 225 *Cal.Rptr.* 297, 306 (1986), review denied (June 5, 1986) (ordering a hospital to comply with a patient's request to discontinue treatment): "If a right exists, it matters not what 'motivates' its exercise. We find nothing in the law to suggest the right to refuse medical treatment may be exercised only if the patient's *motives* meet someone else's approval."

nation. *See Farrell, supra,* 108 *N.J.* at 344–347. Outside experts questioned Mrs. Farrell to confirm that she knew the consequences of the treatment alternatives, that she was not clinically depressed, that the decision was made on her own initiative, and that her decision was not unduly influenced by other parties.[5] In contrast, we cannot make elaborate inquiries of Hilda Peter and Nancy Jobes to satisfy ourselves that their treatment decisions—or, more accurately, their earlier expressed opinions about such decisions—were thoroughly autonomous, voluntary and informed.

We, nevertheless, cling strongly to the belief that we can and should effectuate "self-determination" for the incompetent. Any determination, however, at best is only an optimistic approximation. As the Court stated in *Conroy:*

> The right of an adult who ... was once competent, to determine the course of her medical treatment remains intact even when she is no longer able to assert that right or to appreciate its effectuation.

> . . . .

> Since the condition of an incompetent patient makes it impossible to ascertain definitively his present desires, a third party acting on the patient's behalf often cannot say with confidence that his treatment decision for the patient will further rather than frustrate the patient's right to control his own body. Nevertheless, the goal of decision-making for incompetent patients should be to determine and effectuate, insofar as possible, the decision that the patient would have made if competent. [*Conroy, supra,* 98 *N.J.* at 359–60.][6]

---

[5]The concept of *"undue* influence" shows some of the tensions in the way we evaluate whether a decision respects or disrespects the value of self-determination. We recognize that some forms of influence by other persons are both normal and positive. But at some point, a point not easy to specify, that influence becomes "undue", and is seen as interfering with self-determination.

[6] *Cf. Superintendent of Belchertown v. Saikewicz, supra,* 370 *N.E.*2d at 431:

> [T]he decision in cases such as this should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person.

The right-to-die cases now before the Court illustrate the spectrum along which treatment decisions based on individual self-determination lie, ranging from those that most completely and accurately mirror the actual wishes of the patient to those that only vaguely comport with the patient's views or feelings. In treatment decisions made in the name of incompetent patients, no matter how much evidence we have of subjective intent and actual wishes or how well the guardian knew the patient, and how well-intentioned the patient's guardian, family, and physician may be, there will always be some residual doubt that the decision expresses or effectuates the patient's right of self-determination. In less optimal circumstances, the doubt is greater. As doubt grows, factors other than those relating solely to the patient's wishes or views necessarily intrude upon decisionmaking.

Because we cannot be as sure with treatment decisions made for incompetent patients as with decisions made by competent patients that the particular decision furthers the value of self-determination, we try to compensate by considering other factors and adding substantive standards and procedural safeguards. For example, in *Conroy,* in direct proportion to the doubt inherent in determining the patient's wishes or views, the Court posited a series of tests ranging from pure self-determination to one based on objective factors; it also established elaborate protective procedures for decisions to discontinue treatment for incompetent elderly nursing home patients. *Conroy, supra,* 98 *N.J.* at 381–85. In *Quinlan,* the Court offered a balancing test, involving a comparative weighing of patient wishes or views and objective factors;[7] it also provided a

---

This exercise of imagination becomes much more difficult once we consider that in some cases, *see supra* note 2, the decisionmaker must keep in mind not only the patient's present and future incompetency, but also the fact that she has never been competent in the past.

[7]The balancing test in *Quinlan* described patients' right to refuse medical treatment in a waxing and waning metaphor, there suggesting that in balance

structured decisional framework involving responsible decision-makers. *Quinlan, supra,* 70 *N.J.* at 41.

The inevitability of uncertainty makes it important to recognize the gradations of the right of self-determination. An "objective approach" gets intertwined subtly with the subjective self-determination approach depending upon the circumstances and the degree of doubt attendant upon the effectuation of self-determination.[8] The distinction between the two approaches is often blurred. Objective factors frequently simply gloss over or shore up decisions purportedly based on self-determination. Thus, when the patient is suffering under conditions that are so extreme that discontinuation of treatment seems to be in her "best interests," the courts are less troubled by the doubt that this treatment decision does not truly express the patient's right to self-determination. Indeed, because doubt

---

were only the individual's right of privacy and the State's interest in preventing suicide: "the State's interest *contra* weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims." *Quinlan, supra,* 70 *N.J.* at 41. The formulation of the balancing test has been criticized. *See* Capron, "Borrowed Lessons: The Role of Ethical Distinctions in Framing Law on Life-Sustaining Treatment", 1984 *Ariz.St.L.J.* 647, 656–58. However, this balancing analysis—the objective or physical factors, such as the condition, treatment and prognosis of the patient, becoming increasingly important as doubts increase about whether we are promoting the patient's right of self-determination—can be seen as reflecting a basic aspect of right-to-die cases.

[8]Discussing treatment decisions for elderly incompetent patients influenced by an "objective" standard, one commentator stated:

The aged, especially nursing home residents, are an extremely vulnerable population because of their physical and mental impairments and their dependence on others in their daily lives. Many elderly patients have few or no surviving relatives and are socially isolated.... Watching a relative die can be emotionally draining; families may want not to prolong the end but to begin to grieve and resign themselves to their loss. Even those with more altruistic intentions cannot help but project their suffering onto the incompetent. The family that suffers with a relative in a debilitated condition may assume that the patient must be similarly miserable. [Merritt, "Equality for the Elderly Incompetent: A Proposal for Dignified Death", 39 *Stanford L.Rev.* 689, 724–25 (1987) (footnotes omitted).]

seems inherent in self-determination for an incompetent, objective factors may become conditions for any treatment decision. Courts consider—either explicitly or implicitly—objective factors particularly when the basis for self-determination is attenuated. In such cases, circumstances involving the patient's age, whether she is terminally ill and facing death shortly, whether she is unconscious or in a vegetative state, how burdensome or intrusive the treatment is, and how much pain the patient is suffering are considered in deciding whether to authorize discontinuation of treatment. *See, e.g., Conroy, supra,* 98 *N.J.* at 342 (limiting holding to elderly nursing home residents who suffer from serious and permanent mental and physical impairments and who will probably die within a year); *Delio on Behalf of Delio v. Westchester Cty.,* 134 *Misc.*2d 206, 510 *N.Y.S.*2d 415 (Sup.1986) (refusing to apply right to refuse treatment to patient in chronic vegetative state because he was not terminally ill and because he was only 33 years old), rev'd, 129 *A.D.*2d 1, 516 *N.Y.S.*2d 677 (A.D. 2 Dept. 1987).

Because self-determination for the incompetent is rarely foolproof, because it is frequently unreliable, and because it is almost always problematic, we should consider in greater depth the scope and application of an appropriate standard for determining right-to-die cases when decisions based on self-determination are unattainable or illusory. We must consider whether courts can and should extrapolate from the objective factors that expressly or subliminally influence many self-determination decisions criteria for those cases where no subjective evidence probative of self-determination is available. *See infra* pages 440–41.

### III.

The law has taken two major approaches to the making of medical treatment decisions for incompetent patients, each of which in variant forms has appeared in the opinions of the right-to-die cases. One focuses upon the patient's right of self-determination, the other emphasizes the patient's best in-

terests. The distinctions and relationships between these approaches are the crux of the developing law in the right-to-die cases.

Under the first approach, the court seeks as best it can to effectuate the individual's right to self-determination. The court attempts to determine what the patient would have decided if she were still competent. This approach includes two standards. The first standard applies when we have evidence of sufficient quantity, probity, and specificity of the patient's own past expressions and conduct from which we can extrapolate the patient's actual wishes, what choice she would have made in this treatment decision.[9] *Conroy, supra,* 98 *N.J.* at 361–63; *see Peter, supra,* 108 *N.J.* at 377–380. It is the preferred self-determination standard because it most closely approximates the informed-consent decision of a competent person.

A second standard, also based on self-determination and applicable in this case, involves the substituted judgment of a surrogate decisionmaker. It gives the treatment decision to a close relative or friend of the patient, to a person in a position to fulfill the patient's basic views or philosophy or values. *Ante* at 413–420; *see Quinlan, supra,* 70 *N.J.* at 41–42. The premise for this standard is that intimate knowledge of a friend or relative allows the formulation of a reliable opinion about how the patient would react to the situation, even if that person had never previously experienced or expressed views upon such a situation. The theory of substituted judgment is that if we know someone well enough—her ideals, values, attitudes, phi-

---

[9] Of course there is a difference between even the most considered judgment about a hypothetical decision and actually deciding in the face of the particular circumstances. This may be especially true when, as here, the decision touches upon basic factors: if one is to go on living and in what manner. The difference between the hypothetical decision and the real one should give us some pause before we claim that decisions made for incompetent patients ever fully respect those patients' right of self-determination.

losophy of life—we can figure out how she would have reacted to a new situation.[10]  *See ante* at 415–420.

The self-determination approach is hardly problem-free.  Because of the inevitability of doubt, it carries a risk of unreliability.  See discussion, *supra* pages 435–437.  When the doubt is such that self-determination cannot be based on the provable actual wishes of the patient, the integrity of the decision as effectuating self-determination is only imperfectly assured by resort to the substituted judgment/surrogate decisionmaker standard.  This standard is also problematic, it is "fraught with guesswork," relying as it must "on the imaginative effort of the decisionmaker to construct what the patient would want, given what the surrogate knows."  *See* Minow, "Beyond State Intervention in the Family: For Baby Jane Doe," 18 *U.Mich.J. L.Ref.* 933, 972–73 (1985).  To the extent that this "imaginative effort" will necessarily fall short of certainty about what the patient would have decided, it may be that "[a]t its best the substituted judgment approach may express concerns and sympathy for the patient, rather than actually divining that person's unknown wishes."  *Id.* at 973.

---

[10]The *Peter* case presents a further complication that can arise in applying the self-determination standard for an incompetent patient.  There the substituted judgment is predicated in large measure upon the patient's execution of a durable power of attorney, the patient assigning to a close friend the authority to make all medical decisons for her.  *Peter, supra,* 108 *N.J.* at 378–380.  *Conroy* recognized a durable power of attorney as one method by which a patient might express her intention not to have life-sustaining medical intervention.  *Conroy, supra,* 98 *N.J.* at 361.  However, it is not the mere signing over of authority that makes the resulting decision an expression of the patient's right of self-determination.  It is important that the durable power of attorney was given by the patient to someone who knows her well.  Hilda Peter's giving of a durable power of attorney to her close friend Eberhard Johanning was itself an assertion.  Through her action, Ms. Peter showed that she thought Mr. Johanning knew her well enough to make the treatment decision for her that she would have wanted made.  Obviously there will be cases involving durable powers of attorney in which confidence in the holder may not be so strong.

The second major approach to dealing with the resolution of right-to-die tensions is the best-interests analysis. It purports to minimize or eschew the self-determination criteria based on the subjective wishes or views of the present. A decisionmaker decides to consent to or refuse medical treatment for the patient based on what would be in the patient's best interests, considering "from an external stance the needs, risks, and benefits to the affected person." Minow, *supra*, at 973 (footnote omitted). This approach was denominated an "objective" test in *Conroy, supra*, 98 *N.J.* at 364–68. *See also* Merritt, *supra* note 8.

The problems with the "best interests" analysis are straightforward. In our society persons have different ideas about how the value of life is affected by the loss of brain function, the loss of cognitive abilities, bodily deterioration, or unrelievable extreme pain.[11] A "best interests" standard assumes a consensus that is not there regarding when discontinuation of treatment is in a patient's best interests.

Despite its many limitations, the "best-interests" or "objective" approach requires our attention, because the courts must develop some variation of that approach to deal with the extreme cases where subjective approaches seeking individual self-determination are unavailing. In some settings these approaches—self-determination and best interests—are not necessarily neatly divided but may represent a continuum of values. In *Conroy,* for example, we recognized a middle-ground ap-

---

[11] *Cf. Conroy, supra,* 98 *N.J.* at 367 (citations omitted):

We do not believe that it would be appropriate for a court to designate a person with the authority to determine that someone else's life is not worth living simply because, to that person, the patient's "quality of life" or value to society seems negligible. The mere fact that a patient's functioning is limited or his prognosis dim does not mean that he is not enjoying what remains of his life or that it is in his best interest to die. More wide-ranging powers to make decisions about other people's lives, in our view would create an intolerable risk for socially isolated and defenseless people suffering from physical or mental handicaps.

proach, the limited-objective test, which combined elements of both self-determination and objective physical factors. *Conroy, supra,* 98 *N.J.* at 364–66. We also recognized that failing a self-determination approach, in some circumstances a best-interests analysis under the pure objective test would justify the refusal of medical treatment for a legally incompetent patient. *Id.* at 364–68.[12]

The current cases, in my opinion, fairly impel us to consider in greater depth the kind of approach, decisional process and analytical framework that must be developed to deal adequately with these dilemmas. Particularly, we should consider the interrelationship between decisions we are able to base on self-determination and those that unavoidably must be based on best-interests. We should grapple with the question of what we are to do if Nancy Ellen Jobes had had no one to inform us as to her feelings or wishes in the matter.

Mrs. Jobes requires extensive care. While numerous medications, nutrition and hydration were initially provided through the use of a nasogastric tube, as a result of increasing difficulties with that tube's frequent removal and reinsertion, a gastrotomy tube was surgically inserted into Mrs. Jobes' stomach in December 1980. A life-threatening failure of this gastrotomy tube in June 1985 led to the closing of the gastric fistula, a new cutting in her abdominal cavity and the establishment of a feeding jejunostomy tube in her small intestine. Mrs. Jobes

---

[12]Because of its criticism of a "quality of life" approach, *see supra* note 11, the majority opinion in *Conroy* distanced itself from any claim of judging a patient's quality of life. The majority, in its limited objective and objective tests, sought a factor that all persons would consider as detriment—the factor of pain; using an arguable consensus to try to turn the subjective choice (what *a given patient* would have wanted) into an objective standard (what choice we can impute to *any* patient). *See id.* at 367–68. Given that no such consensus should be presumed in treatment decisions, the courts should more directly confront, rather than finesse, the difficulties intrinsic to objective approaches. *See* Frug, "The Ideology of Bureaucracy in American Law", 97 *Harv.L.Rev.* 1276, 1286–93 (1984) (discussing the inability to separate the subjective from the objective in legal standards).

has been hospitalized at least three times since the performance of the jejunostomy for complications arising from its insertion and employment. It is through this tube that many medications, nutrition (a commercially produced synthetic pre-digested nutritional formula) and hydration are provided. An automatic electrically driven pump provides a constant slow rate of liquid to the bowel where it is digested. Mrs. Jobes is incontinent and requires a catheter to continuously irrigate her bladder. She receives routine enemas for bowel evacuation. Mrs. Jobes also has a tracheostomy, which is covered with a plastic shield to which a flexible tube is attached. Through this tube she receives air from a compressor in order to afford moisture to the tracheotomy. The mist is driven by a mechanical air compressor. There is a suction machine adjacent to the bed available if necessary to remove her saliva. Mrs. Jobes cannot swallow. She is given antibiotics when necessary, as well as medication intended to prevent seizures. Mrs. Jobes' muscles have atrophied and her limbs are rigidly contracted. Her extremities cannot move. Her closely clenched fingers are padded to prevent the skin between them from breaking down.

To summarize, Mrs. Jobes' physical condition is extreme: major organs and systems have failed; she is profoundly comatose; her body has atrophied, contracted and deteriorated; she is totally incontinent. Her treatment is overwhelmingly burdensome and intrusive: she has been repeatedly hospitalized for more extended, extraordinary medical treatment; she requires two surgically-implanted devices; she must be evacuated and irrigated; she must be handled constantly and prevented from self-mutilation. Her prognosis is hopeless; she cannot live without massive, extraordinary medical and health care measures. One may fairly and reasonably ask whether these bodily intrusions and invasions upon a person in such dire condition and so close to death, undertaken for the best of motives, have not reached a point that it is not possible to

perpetuate her life without destroying her dignity and denigrating her humanity.[13]   As I stated in *Conroy:*

The medical and nursing treatment of individuals *in extremis* and suffering from those conditions entails the constant and extensive handling and manipulation of the body.   At some point, such a course of treatment upon the insensate patient is bound to touch the sensibilities of even the most detached observer.   Eventually, pervasive bodily intrusions, even for the best motives, will arouse feelings akin to humiliation and mortification for the helpless patient.   When cherished values of human dignity and personal privacy, which belong to every person living or dying, are sufficiently transgressed by what is being done to the individual, we should be ready to say: enough.   [*Conroy, supra,* 98 *N.J.* at 398–99 (concurring in part and dissenting in part).][14]

---

[13]In some cases, if authorization for the discontinuation of treatment is not granted, the treatment might maintain the patient in her chronic vegetative state indefinitely, "the longest recorded survival by such means extending for thirty-seven years." *Brophy v. New England Sinai Hosp., Inc.,* 398 *Mass.* 417, 497 *N.E.*2d 626, 637 (1986).   Arguably, for such patients, "further survival promises only a 'life' of unending torment, incapacity and, in effect, dehumanization."   Amicus Brief, Medical Society of the State of New York, *Matter of Storar,* 52 *N.Y.*2d 363, 438 *N.Y.S.*2d·266, 420 *N.E.*2d 64 (1981).

[14]A number of commentators have argued that "quality of life" factors— factors other than physical pain—should be considered in medical treatment decisions when there is insufficient evidence of the patient's wishes.   *See, e.g.,* Merritt, *supra* note 8:

If no clear evidence of intent exists, a court must become involved in the decisionmaking.   Life-sustaining treatment can be withheld or withdrawn if the court finds that such action would serve the patient's best interests and result in a dignified, humane death.   At this stage, the court should appoint a guardian *ad litem* to present all reasonable arguments why the treatment should not be terminated. . . .

The court should first consider the probable duration of the patient's life with treatment and the quality of that life.   Quality is not measured by social utility or degree of intelligence, but is instead determined by the patient's current level of conscious functioning as compared to the level of functioning that the individual has enjoyed during the majority of his life.   The court can measure this by examining testimony about the patient's level of brain activity, self-awareness, and awareness of others. . . .   The potential for abuse is circumscribed by the . . . requirement that the . . . court first find that death is imminent and irreversible. . . .

A court must weigh the duration and quality of life provided by treatment against the physical suffering, the extent of bodily intrusion required by treatment, and the resultant loss of patient dignity.   (*Id.* at 734–35 (footnotes omitted).]

Based upon such factors it should be possible to structure critical treatment decisions that are reliable, understandable and acceptable.

[I]t may be possible to gradually discern acceptable societal norms of humane treatment of moribund patients. Just as constitutional norms of personal privacy must be shaped by "the traditions and collective conscience of the people," so the common law of handling dying patients will be shaped by shared notions of how "we" citizens want to be treated at that critical juncture. That is, shared notions of human dignity will ultimately govern decisionmaking on behalf of incompetent moribund patients. [N. Cantor, *Legal Frontiers of Death and Dying* 76–77 (1987) (footnotes omitted)]

*See id.* at 180–82. *See generally id.* at 58–76 (discussing the various decisionmaking criteria for incompetent patients).

Obviously, an "objective" or "best-interests" approach to treatment decisions in such cases has its own moral and conceptual problems. *See supra* page 440 & note 11. It is because of the unescapable moral ambiguity of these decisions that, before such approaches can be applied to right-to-die cases, appropriate decisionmaking processes must be developed. We should, I suggest, be able to turn to the persons regularly involved in life-and-death decisions. Such individuals are in the best position, borne of experience, training and attitude, to evaluate fairly and impartially the numerous factors that are relevant to a decision based in whole or in part on patient best-interests. These persons should include those we turn to in a substituted-judgment approach case, namely, the doctors and health-care providers and responsible government and institutional representatives. Included should also be persons grounded in religious and ethical training. *See Rothenberg,* "Demands for Life and Requests for Death: The Judicial Dilemma", in *Death and Decision* 149 (E. McMullin, ed. 1978); *post* at 450–52. (Pollock, J., concurring) Their informed and collective judgment should be able satisfactorily to determine that in some cases

*See* President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life-Sustaining Treatment* 134–35 (1983) (suggesting "quality of life" factors to consider in substituted judgment treatment decisions).

treatment to perpetuate life in only its most primitive form has gone beyond any conceivable medical or moral purpose, its perpetuation offends fundamental sensibilities, and it should stop.

## IV.

It is important to acknowledge that the inquiry posed by these appeals has as much to do with judicial attitudes as with judicial decisions. The emotional power of the right-to-die cases comes in part from our ability to identify with the actors in the legal drama. *See* Minow, *supra,* at 990–94. Judges as individuals bring to bear their own personal experiences and feelings to these cases and to the various parties involved—the patient, the family, the friends, the doctors and other health care providers. Because we identify with the actors, judges may by their own experiences be pulled too deeply into the drama of the situation.

There is some justified belief that judges cannot in these cases achieve evenhandedness and impartiality. *See* Rothenberg, *supra,* at 131–47. Hence, the response of this Court and of other courts to the right-to-die cases can in this respect be understood to be a search for solutions that will enhance impartiality and increase public confidence in particular treatment decisions. *See Farrell, supra,* 108 *N.J.* at 343–44. The courts are searching for procedures that will at the same time respect the common-law right to refuse medical treatment and assure the general public that such decisions are being made for legitimate reasons. It is a difficult and delicate balance. *See Farrell, supra,* 108 *N.J.* at 354–59.[15] These considera-

---

[15]There is a danger that if the Court "errs" in the direction of prescribing procedures that are too meticulous and burdensome, the objectives to be achieved in terms of self-determination may be frustrated. For example, the standards promulgated in *Conroy* provided a high degree of procedural protections. 98 *N.J.* at 384–85. Though "well over 100" persons have inquired with the office of the Ombudsman for the Institutionalized Elderly regarding the

tions underscore the importance of a sound judicial attitude toward this kind of controversy.

Equally important is the question touching upon the legitimacy of the judicial role. Some persons have argued that the courts should not intervene in the right-to-die area. Perhaps the most obvious justification for judicial involvement in this area is that the plaintiffs have come to the courts, and the courts may not turn them away. *See Conroy, supra,* 98 *N.J.* at 345; *Farrell, supra,* 108 *N.J.* at 341–344. Furthermore, the characterization of the judicial role as state intervention is inaccurate and misleading. It is important to recognize that the state has always been involved directly or indirectly. *See* Minow, *supra,* at 936–37, 951–53. For example, in *Quinlan,* Joseph Quinlan, the patient's father, was not asking the state to intervene in the medical treatment decision; he was asking the courts to modify the nature of the intervention the state had already made: enjoining the local prosecutor from bringing criminal actions against any person involved in the choice to discontinue medical treatment. *See Quinlan, supra,* 70 *N.J.* at 18–19. The court may properly be viewed as performing its traditional role of adjudicating conflicting individual claims based on uncertain legal rights and duties in a case properly within its jurisdiction.

It cannot be overemphasized that the Court's role in these cases is circumspect. This because of the inherent complexity of the problems, and their inescapable social and moral implications. As evident from our disposition in these appeals, judicial involvement can be understood not merely as an attempt to elaborate the distinction between a person refusing medical treatment and a person taking her own life. Rather, in these cases, the Court in effect has set broad boundaries within which

procedures *Conroy* requires before medical treatment can be withdrawn from nursing home patients, only one case has been officially brought to the Ombudsman's attention. *Curbs on Ending Life Supports Are Ignored,* New York Times, November 28, 1986, at B15, col. 1.

deliberations are left to the intimate setting of doctor-patient-family. This can be seen as a form of judicial deregulation reflecting a deference to individual autonomy and to the professional relationship in which treatment decisions are made.

In the final analysis, we are struggling to structure a decisional framework that will generate trust, confidence, and acceptance. Our unease and dissatisfaction with particular right-to-die opinions mirror our failure thus far to achieve this level of assurance. The problems of trust and distrust hover over these cases.

Because of our incertitude, we cannot say that particular right-to-die decisions were clearly correctly decided while other decisions were dangerously wrong. Decisions of such painful difficulty cannot be so easily rejected or so quickly applauded. Given the "personal vulnerabilities" and the complexity of the issues involved in the right-to-die cases, no substantive or procedural standard will ever be able completely to dispel or hide the doubt engendered by these treatment decisions; the achievement of trust and confidence will be painstaking. *See* Minow, *supra*, at 998–99.

These considerations, spanning difficult individual and societal interests, argue forcefully for legislative intercession and resolution. In the meantime, the Court cannot responsibly evade its own duty; it must decide these cases and promulgate the criteria upon which its decisions were based. In these cases, therefore, there are sound reasons why the Court should suggest the substantive criteria and decisional processes by which, in circumstances not quite covered by today's decisions, the next tragic victim may secure a dignified ending of life.

POLLOCK, J., concurring.

Subject to the thoughts expressed in this opinion, I join in the opinion of the Court and in the concurring opinion of Justice Handler.

I begin by endorsing the Court's reliance on a competent patient's right of autonomy to determine the course of his or her medical treatment. In consultation with physicians and other trusted advisers, a patient generally should have the right to determine when treatment should both begin and end. I also agree with the Court's recognition of the family as the appropriate social unit to speak for the patient when the patient cannot speak for himself or herself. In death as in life, the interests of family members are bound together.

If a once-competent patient in a persistent vegetative state has not clearly expressed his or her wishes about the termination of treatment, his or her family is remitted to the substituted-judgment approach. In some such cases, evidence of the patient's wishes will be clearer than in others. As the evidence becomes less persuasive, considerations other than the patient's preference may manifest themselves, and at some point along the spectrum, a substituted judgment may shade into a best-interests analysis. With respect to an incompetent patient in a persistent vegetative state, such as Nancy Ellen Jobes, a substituted-judgment analysis may take into account the patient's present condition, a consideration often associated with a best-interests analysis, and lead to the conclusion that a patient would prefer not to be maintained in his or her present condition. Thus, an objective approach, such as a best-interests analysis, "gets intertwined subtly with the subjective self-determination approach depending upon the circumstances." *Ante* at 436 (Handler, J., concurring). The blending of the two concepts is not surprising: patients generally want for themselves that treatment or non-treatment that is in their best interests. Thus, in exercising their substituted judgment, family members ordinarily will make a treatment decision that is in the patient's best interests.

With some patients, such as newborn infants or adults who have always been incompetent, it is practically impossible for anyone to ascertain their preferences. When there is no evidence of a patient's preferences, the decisionmaker should

focus on the best interests of the patient. It is at this point that we must beware of the slippery slope that could lead to the unwarranted termination of life. Courts are not the right place to make utilitarian judgments about the value of human life. As we said in *In re Conroy*, "we expressly decline to authorize decisionmaking based on assessments of the personal worth or social utility of another's life, or the value of that life to others." 98 *N.J.* 321, 367 (1985).

The interests of the patient and his or her family will not always be identical, and distinguishing those interests can be difficult. The majority opinion recognizes as much and directs that when disagreement arises within a family, between physicians, or between family and physicians, the parties should go to court. *Ante* at 427. The more difficult problem arises when the family is not certain about the patient's wishes and, nonetheless, wants to make "the right decision." That tormenting dilemma may properly lead a family and physician to consider the best interests of the incompetent patient, a consideration that should begin with the premise that those interests ordinarily lead to the decision to continue life. As previously indicated, however, the focus should be on the patient in his or her present condition. So focused, the decision-maker should consider, among other relevant factors, the patient's age, level of consciousness, condition, and isolation, together with the restrictions on his or her physical freedom. Also to be considered are the invasiveness of the treatment and the pain experienced by the patient. For some patients, life expectancy will be a relevant consideration, but for patients in a persistent vegetative state, the focus should be on the likelihood of the patient's return to a cognitive and sapient life. *In re Peters*, 108 *N.J.* 365, 374 (1987); *In re Quinlan*, 70 *N.J.* 10, 51, *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976).

Although the patient's preferences are more readily associated with the substituted-judgment approach, those preferences, even if not sufficient to support an exercise of substituted

judgment, should be considered in a best-interests analysis. In such an analysis, the decisionmakers should consider the totality of the benefits and burdens of the patient's life in his or her present condition. *Ante* at 437 (Handler, J., concurring); *In re Conroy, supra,* 98 *N.J.* at 398 (Handler, J., concurring). To some extent, the preceding analysis is reminiscent of the statement in *Quinlan, supra,* 70 *N.J.* at 41, that the State's interest in preserving life weakens "as the degree of bodily invasion increases and the prognosis dims."

For Nancy Ellen Jobes, a best-interests analysis supports the conclusion that the life-sustaining treatment being administered to her is merely forestalling her inevitable death. Her tragic condition is graphically described in both the majority opinion, *ante* at 401–407, and in the concurring opinion of Justice Handler, *ante* at 441–443. Her family and physicians may derive some comfort from knowing that an objective analysis of the best interests of the patient, like their exercise of substituted judgment, points to the conclusion that the time has come to stop prolonging her treatment.

Termination-of-treatment cases involve not only legal and medical, but also ethical, judgments. As an aid to physicians and families, hospitals and other health-care facilities, such as nursing homes, should give serious consideration to making available the services of ethicists and institutional ethics committees. Hospitals that cannot afford or attract a bio-ethicist could, nonetheless, authorize the establishment of an ethics committee. Such a committee can not only perform an educational and policy-making role, but also act as an advisor to the patient's family and physician.

The suggestion of such a committee traces its origins to *In re Quinlan, supra,* 70 *N.J.* at 49–50, where the Court contemplated an "ethics committee" to confirm the medical prognosis of the patient and, thereby, to immunize the doctor and the hospital from civil and criminal liability. More recently, the President's Commission endorsed the formation of ethics com-

mittees "particularly for decisions that have life-or-death conse-quences for incompetent patients." President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life-Sustaining Treatment* 5 (1983) (President's Commission Report); *see also* Fletcher, *Goals and Process of Ethics Consultation in Health Care*, 2 *Biolaw, A Legal and Ethical Reporter on Medicine, Health Care and BioEngineering* S:37 (1986) (describing re-cent growth of ethics consultation in health care institutions in United States and Canada); Annas, *Ethics Committees in Neonatal Care: Substantive Protection or Procedural Diver-sion?*, 74 *Am.J. of Pub. Health* 843 (1984) (function of ethics committee is to protect both the institution and the patient by aiding in policy as well as individual decisionmaking). The kind of committee envisioned by the President's Commission is not a prognosis committee, as contemplated by *Quinlan*, but a com-mittee that could "advise patients, families, and practitioners who are trying to make informed decisions." President's Com-mission Report at 166. Such an ethics committee would include a diverse membership drawing upon physicians, clergy, ethi-cists, nurses, attorneys, and members of the general public. *Id.* Through reviewing decisions for prospective treatment "made by the family of an incapacitated person and his or her practitioner * * * the committee would seek to ensure that the interests of all parties, especially those of the incapacitated person, have been adequately represented, and that the decision reached lies within the range of permissible alternatives." *Id.* at 164. As envisioned by the President's Commission, "[w]hen ethics committees serve as reviewers, they do not supplant the principal decisionmaker for incapacitated persons (that is, fami-lies and practitioners) but they do provide for efficient review without regularly incurring the liabilities of judicial review." President's Commission Report at 164. In this regard, the Public Advocate has urged that "[e]thics committee review can be more sensitive, prompt, and discreet than either judicial review or the Ombudsman's investigation. This makes such

intervention acceptable to both the family and the medical community, while assuring that decisions involving the life and death of incompetent patients will serve their best interests." (Citation omitted.) Consistent with that suggestion, the New Jersey Hospital Association's Ethics Task Force, which was formed by the Council on Professional Practice, "recommends that hospitals seriously consider the establishment of institutional ethics committees * * *." Ethics Task Force, Council on Professional Practice, New Jersey Hospital Association, *Considerations and Recommendations for Institutional Ethics Committees* 7 (1986). As perceived by the Task Force, an ethics committee "enhances, not replaces, the all important patient/family/physican relationship and affords support for decisions being made within that triad, relying on the courts as a last resort." *Id.*

One illustration of an ethics committee is the infant care review committees that consider the treatment of disabled infants suffering from life-threatening conditions. The Department of Health and Human Services has published guidelines in which it "strongly encourages hospitals that provide care to infants, especially those with tertiary level neonatal care units, to establish Infant Care Review Committees * * *." 50 *Fed. Reg.* 14894. Among other things, the infant care review committees may counsel physicians and the infant's family concerning the withholding or withdrawing of life-sustaining treatment. *Id.* at 14895–96.

Another illustration is the patient care advisory committees that have been authorized by the Maryland Legislature effective as of July 1, 1987. *Md. Health-General Code Ann.* §§ 19–370 to –374 (Supp.1986). On request of a "petitioner," a term that includes, among others, a physician and a family member, § 19–370(d), an advisory committee "shall offer advice in cases involving individuals with life-threatening conditions." § 19–373(a). Thus, one state has already enacted legislation recognizing the role of ethics committees in decisions involving the termination of treatment.

Recourse to an ethics committee need not be mandatory, and the decision to seek ethical guidance is best left to the judgment of the patient or someone who can speak on his or her behalf, such as a family member or physician. While leaving the decision to him or her, an ethics committee could provide guidance and support to the ultimate decisionmaker. Creation and implementation of ethics committees raises questions concerning the structure, function, and duties of the committee, as well as the confidentiality of its records and immunity from suit of its members. As the court returns the decisionmaking authority to patients' families and physicians, the answers to those questions merit the consideration of health care officials and the Legislature.

O'HERN, J., dissenting.

While I dissent from the disposition in this case primarily for the reasons stated in the companion case of *In re Peter*, 108 *N.J.* 365 (1987), I reiterate my respect for the aggrieved family and their conscientious decision. I ask them only to consider that the restraints of the law that seem so cruel to them may reflect an equally profound respect for patients not surrounded by a family as loving as theirs. It is not possible for us to construct a substantive principle of law based upon the intact family status. We must construct a substantive principle of law that will endure in all circumstances.

I add only, with respect to the discussion of this case, a concern about a court compelling a health care provider to furnish treatment that is contrary to its own medical standards. I find it difficult to understand how we can order nursing professionals with an abiding respect for their patients to cease to furnish the most basic of human needs to a patient in their care. I do not believe that such an order is essential to the Court's decision, and it may impinge upon the privacy rights of those nursing professionals. This is not a case in which the physical facilities of a licensed health care provider are being denied to professionals who disagree with the provider's policy,

*Doe v. Bridgeton Hosp. Ass'n, Inc.*, 71 *N.J.* 478 (1976), *cert. denied,* 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.*2d 1100 (1977); it is a case in which the health care providers firmly believe the treatment is adverse to the patient. I believe a proper balance could be obtained by adhering to the procedure adopted in *In re Quinlan,* 70 *N.J.* 10, *cert. denied sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976), that would have allowed the nonconsenting physician not to participate in the life-terminating process. This was essentially the approach taken by the conscientious treating physician in Kathleen Farrell's case. *In re Farrell,* 108 *N.J.* 335 (1987).

Applying the principles of *In re Conroy,* 98 *N.J.* 321 (1985), to this case, I find that Nancy Jobes's condition at least is closer to Claire Conroy's condition than is Hilda Peter's in that Nancy Jobes has some recognized dim perceptions of reality, and certain nurses believe the patient responds to their presence in her room. But the evidence does not meet the *Conroy* test of objective distress to the patient; nor is the patient facing an imminent and inevitable death. Therefore, I respectfully dissent.

CLIFFORD, HANDLER and POLLOCK, JJ., concurring in result.

*For modification and affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*For reversal*—Justice O'HERN—1.